[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
INTRODUCTION
This case was tried to the court on the Second Revised Amended Complaint which contains two counts, as follows:
 Count One which prays, pursuant to § 47a-21(d)(2) of the General Statutes, recovery of twice the amount which the plaintiffs, David and Sarah Keill, delivered to the defendant, F. C. Howland ("Dr. Howland"), as a security deposit in connection with the rental by the Keills of a residential apartment (the "Keill apartment") from Dr. Howland; and
 Count Two which prays, pursuant to § 42-154, recovery of statutory damages of $100, together with an attorney's fee not in excess of $100, on the ground that the lease between the Keills and Dr. Howland (the "Lease") does not comply with the plain language requirements of § 42-152 of the General Statutes.
Section 47a-21(d)(2) provides: CT Page 11170
 Upon termination of a tenancy, any tenant may notify his landlord in writing of such tenant's forwarding address. Within thirty days after termination of a tenancy, each landlord other than a rent receiver shall deliver to the tenant or former tenant at such forwarding address either (A) the full amount of the security deposit paid by such tenant plus accrued interest as provided in subsection (i) of this section, or (B) the balance of the security deposit paid by such tenant plus accrued interest as provided in subsection (i) of this section after deduction for any damages suffered by such landlord by reason of such tenant's failure to comply with such tenant's obligations, together with a written statement itemizing the nature and amount of such damages. Any such landlord who violates any provision of this subsection shall be liable for twice the value of any security deposit paid by such tenant.
Section 42-154 provides:
 Any creditor, seller or lessor which fails to comply with section 42-152 shall be liable to a consumer who is a party to the consumer contract for statutory damages of one hundred dollars plus, at the discretion of the court, an attorney's fee not to exceed one hundred dollars.
Dr. Howland has counterclaimed for damages suffered by her as the result of breaches by the Keills of the Lease.
The facts and law relating to Count One and the Counterclaim are addressed together, but separately from the facts and law relating to Count Two.
COUNT ONE AND COUNTERCLAIM
Facts
The following facts are found by the court: CT Page 11171
 The Lease was executed by all the parties on April 15, 1993, had a term of three years, called for monthly rent of $250 for the first month and $750 for the remaining months of the first year, $775 for the second year and $800 for the third year, and called for a security deposit of $1,500 to be delivered by the Keills to Dr. Howland;
 On or about May 1, 1993, the Keills delivered to Dr. Howland a check drawn on their joint account, signed by both of them, payable to Dr. Howland in the amount of $1500 as a security deposit;
 On or about October 15, 1993, because of domestic problems, the Keills agreed to separate, and thereafter David Keill established another residence while Sarah Keill remained in the Keill apartment, by herself, until November 22, 1993, when she also established another residence;
 On October 18, 1993, Sarah Keill telephoned Dr. Howland and said that the Keills were separating, that neither of them could afford the Keill apartment without a contribution from someone else, that Sarah Keill would try to find a replacement tenant or that she might try to find a roommate with whom she could share the expense of the apartment and that Sarah Keill was willing to remain in the Keill apartment until she found a replacement tenant. During that telephone conversation, Dr. Howland told Sarah Keill that she would be out of town in late November and early December;
 During their telephone conversation of October 18, 1993, an implied agreement was made by Sarah Keill and Dr. Howland which provided that if the Keills found a replacement tenant who was acceptable to Dr. Howland and who was willing to enter into a new lease, containing the same terms as the Lease, with Dr. Howland for a term of at least 12 months, the Keills would be released from their remaining obligations under the Lease;
 Starting on October 18, 1993, and ending on November 14, 1993, the Keills made efforts to find a replacement tenant. The Keills made no such efforts after November 14, 1993. The Keills did not produce a replacement CT Page 11172 tenant ready, willing and able to meet the terms of a lease provided for in the implied agreement of October 18, 1993;
 On November 2, 1993, at the request of David Keill, a lawyer sent a letter to Dr. Howland, by certified mail, return receipt requested, stating:
 He represented the Keills; Because of personal circumstances, the Keills would be forced to break the Lease; The Keills had located "new tenants"; "In view of the above development (locating new tenants) it is the Keill's (sic) intention to vacate the premises on or about November 30, 1993 and to have the new tenants, Sue and Andrew Whitty, assume the lease"; (Exhibits 5 and Y)
 Dr. Howland never received the certified letter of November 2, 1993;
 The Whittys did not rent the Keill apartment because they found another which was closer to Sue Whitty's place of employment;
 During the 1980's, Dr. Howland purchased the building ("the Howland building") in which the Keill apartment is located and acted as her own general contractor in renovating it, as a result of which she is familiar with its structural design;
 The Keill apartment is located on the second floor of the Howland building, and the living room of the Keill apartment is directly above the living room of the apartment on the first floor of the Howland building (the "first floor apartment");
 All the rooms in the first floor apartment, except the living room, have dropped ceilings above which is insulation, so that sound from the Keill apartment doesn't trouble the occupants of the first floor apartment when they are in rooms in the first floor apartment other than the living room; CT Page 11173
 Unlike the other rooms in the first floor apartment, the living room has neither a dropped ceiling nor insulation between its ceiling and the floor of the living room in the Keill apartment, so that if the living room of the Keill apartment does not have a rug on the floor, sounds from that living room are disturbing to people in the living room of the first floor apartment;
 Prior to renting the Keill apartment to the Keills, Dr. Howland had rented the Keill apartment to other tenants who had children, on the condition that a rug be used in the living room to eliminate the noise problem;
 David Keill referred Carla Condry to Dr. Howland as a potential replacement tenant;
 Carla Condry and Dr. Howland had a brief telephone conversation on November 14, 1993, during which Carla Condry said that she had children, and Dr. Howland asked if David Keill had explained to her that there was a noise problem in the living room;
 Carla Condry asked Dr. Howland, three times, if she was refusing to rent the Keill apartment to her because she had children, and three times Dr. Howland answered no;
 Dr. Howland did not refuse to rent the Keill apartment to Carla Condry because she had children;
 Carla Condry was not willing to lease the Keill apartment for more than nine months, and she did not appear to be financially able to pay the rent, utility and fuel charges for the Keill apartment;
 Sarah Keill suggested to two engineers from Sikorsky that they contact Dr. Howland about renting the Keill apartment, but they did not do so;
 Sarah Keill suggested to a woman named Roz that she contact Dr. Howland about renting the Keill apartment, and Roz contacted Dr. Howland. Dr. Howland was interested in pursuing with Roz the rental of the Keill apartment, but Roz broke off the discussions; CT Page 11174
 Dr. Howland did not commit any act which violated the implied agreement reached between Sarah Keill and her on October 18, 1993, nor did she fail to perform any act required of her by that implied agreement;
 Before November 20, 1993, David Keill told Dr. Howland that she'd be getting some materials from him, but that she should ignore them because they were for legal purposes only;
 On November 20, 1993, between 7:00 a.m. and 8:15 a.m., Dr. Howland left her home for a vacation, from which she returned to her home on December 5, 1993;
 On November 20, 1993, after Dr. Howland had left for vacation, David Keill hand-delivered to Dr. Howland's home a copy of a letter from him to her (Exhibit 10), the original of which was mailed to her office, which said, inter alia, ". . . we will expect the full return of our
security deposit," (emphasis added) and which enclosed one set of keys to the Keill apartment and a copy of the letter of November 2, 1993 from the Keills' lawyer to Dr. Howland;
 After Sarah Keill moved her residence from the Keill apartment on November 22, 1993, she did not contact Dr. Howland to advise her that she had moved, or of her forwarding address, until January 14, 1993;
 On November 30, 1993, David Keill hand-delivered to Dr. Howland's home a copy (Exhibit 6) of a letter from him to her, the original of which was addressed to her office, which said that the Keills were vacating the Keill apartment as of that date, which said, "Please return the full amount of the security deposit to me," (emphasis added) and which enclosed two sets of keys to the Keill apartment;
 While Dr. Howland was away on vacation from November 20, 1993 to December 5, 1993, her mail was collected by someone else. All of that mail, including Exhibits 6 and 10 and their enclosures, was delivered to Dr. Howland on December 6, 1993;
Sometime shortly after December 6, 1993, Dr. Howland CT Page 11175 turned over to her attorney, Joseph Mirrione, all of the materials which had been left at her home by David Keill while she was away on vacation;
 A large envelope (Exhibit T), which either was delivered to Dr. Howland's home on November 20, 1993 and contained Exhibit 10 and its enclosures or was delivered to Dr. Howland's home on November 30, 1993 and contained Exhibit 6 and its enclosures, had on its outside a handwritten note from David Keill to Dr. Howland stating that there was still cleaning to be done and that "we may need to work something out if she (Sarah Keill) doesn't follow through";
 Nothing was thereafter worked out between David Keill and Dr. Howland regarding cleaning of the Keill apartment;
 By his letter of November 30, 1993, David Keill provided to Dr. Howland his forwarding address;
 Between December 5, 1993 and December 21, 1993, Dr. Howland had a conversation with David Keill, and during that period Dr. Howland believed that Sarah Keill still lived in the Keill apartment, that there was still one set of keys to the Keill apartment outstanding and that the cleaning of the Keill apartment had not been completed. Dr. Howland continued to hold those beliefs until shortly after January 5, 1994;
 From December 21, 1993 until January 5, 1994, Dr. Howland was away on vacation;
 On December 23, 1993, Attorney Mirrione wrote to David Keill stating that he represented Dr. Howland and that he understood there might be a dispute between the parties;
 Shortly after her return from vacation on January 5, 1994, Dr. Howland went to the Keill apartment and learned, for the first time, that neither Keill was living there;
 On January 12, 1994, Attorney Mirrione wrote to David Keill stating that the Keills' security deposit was CT Page 11176 being held to compensate Dr. Howland for damages she might suffer as a result of the Keills' actions and requesting a forwarding address for Sarah Keill;
 By her letter of January 14, 1994 to Attorney Mirrione, Sarah Keill advised him of her forwarding address and that:
 The security deposit for 221 Greene Street (the Howland building) was paid entirely from David Keill's personal money. Therefore the entire deposit of $1,500.00 should have been forwarded to him. (Exhibit A);
 Before the receipt of Exhibit A, neither Attorney Mirrione nor Dr. Howland knew Sarah Keill's forwarding address nor to whom the security deposit belonged;
 On January 19, 1994, Attorney Mirrione wrote to Sarah Keill stating that the Keills' security deposit was being withheld as damages for the Keills' breach of the lease;
 The primary market for rental of the Keill apartment consisted of members of the Yale community;
 During the week following the time when she learned that both Keills had moved out of the Keill apartment, Dr. Howland began looking for a new tenant. Her usual method of looking for a new tenant was to place an ad in the Advocate, to post the vacancy with the housing office at Yale and to mention the vacancy to Father McGuire of St. Anthony's Church, to real estate agents whom she knew and to the Chief of Medicine at Yale, because all of those people come into contact with people looking for apartments. After learning that the Keills had moved out, she did all of those things except to post the vacancy with the housing office at Yale. She did not post the vacancy there because there is very little demand for housing within the Yale community between September and June. Dr. Howland's judgment not to post the vacancy with the housing office at Yale at that time was reasonable;
The Keill apartment was equipped with smoke CT Page 11177 detectors when the Keills took occupancy. The smoke detectors were removed before the Keills moved out. Notice of the lack of smoke detectors was not given by the Keills to Dr. Howland until November 13, 1993. (Exhibit 11) The smoke detectors were removed by one of the Keills;
 From March 17, 1994 until June 1, 1994, Dr. Howland was prohibited from renting the Keill apartment to anyone other than Carla Condry, as the result of a housing discrimination complaint which was filed by Carla Condry. While the court does not directly determine the merits of that housing discrimination complaint, it is found that the removal of the Keill apartment from the rental market from March 17, 1994 until June 1, 1994 did not result from any unlawful or wrongful act by Dr. Howland;
 Before the Keill apartment was leased to the Keills in April 1993, the apartment had been vacant for seven months while Dr. Howland looked for a tenant;
 Before March 17, 1994, Michael and Terry Stewart offered to rent the Keill apartment for $875 per month, commencing sometime after March 17, 1994. However, the Stewarts were unable to take possession of the Keill apartment because of the restriction on leasing that existed from March 17, 1994 to June 1, 1994;
 During June 1994, Dr. Howland entered into a lease of the Keill apartment with a new tenant for a term of one year, commencing July 1, 1994, at a monthly rental of $875. The Keill apartment was occupied under that lease from July 1, 1994 until June 30, 1995;
 Prior to granting occupancy of the Keill apartment to the new tenant on July 1, 1994, Dr. Howland took no action to terminate the Lease;
 During the time Dr. Howland was looking for a new tenant for the Keill apartment (starting in January 1994), she was asking rent of $875 per month and a lease term of one year. Although the rent sought was in excess of that which the Keills were obligated to pay under the Lease, it was a fair rent given the one-year lease term sought by Dr. Howland (as opposed to the three-year Lease CT Page 11178 which the Keills had executed for a lower rent), as evidenced by the fact that within approximately two months she found the Stewarts who were willing to pay $875 per month and the fact that, within one month after the expiration of the prohibition on leasing the Keill apartment to anyone other than Carla Condry, she was able to execute a lease with a new tenant at $875 per month for a one-year term;
 The last month for which the Keills paid rent under the Lease was November 1993;
 The Keills' failure to pay rent for months subsequent to November 1993 was a breach of the Lease;
 Upon learning, shortly after January 5, 1994, that the Keill apartment was vacant, Dr. Howland made reasonable efforts to rent it at a fair rental in mitigation of damages;
 By granting occupancy of the Keill apartment to a new tenant on July 1, 1994, Dr. Howland manifested her unambiguous intention to terminate the lease;
 Between the time the Keills breached the lease and July 1, 1994, Dr. Howland suffered the following losses and incurred the following expenses in maintaining the vacant Keill apartment and its adjacent common areas, and in her efforts to rent the Keill apartment:
 Lost rent, December 1993 through April 1994 — 5 months @ $750 $3750.00
 Lost rent, May and June 1994 — 2 months @ $775 1550.00
Electricity charges 390.13
Fuel 1,692.73
 Advertising 157.54 --------- Total $7,540.40;
If calculated on a time basis at a reasonable hourly CT Page 11179 rate for services performed by him in enforcing the Keills' obligations under the Lease, the fee to which Dr. Howland's attorney would be entitled is in excess of 15% of the amount of the judgment entered hereinafter on the counterclaim;
 Exhibit AA contains bills for expenses incurred by Dr. Howland which she claims are recoverable under Paragraph Third of the Lease which provides that the Keills are liable for "all attorney's fees and other expenses incurred by the Landlord in enforcing any of the obligations under this lease." (Emphasis added.) Three of those bills (Federal Express of March 27, 1994, Phyllis Teixeira of April 7, 1994, and Phyllis Teixeira of July 21, 1994) reference litigation other than this case, and are not recoverable. A bill of Dynatronic Laboratories, Inc. is for analysis of a tape recording, but no evidence was introduced concerning that analysis and that bill is not recoverable. The remaining bills are for sheriff's fees and transcript fees. However, no evidence was introduced to show what portion, if any, of those expenses was incurred in prosecuting Dr. Howland's Counterclaim rather than in defending against the two counts of the Second Revised Amended Complaint, and so no portion of those expenses is recoverable.
Discussion
 When Landlord's Obligation Under § 47a-21(d)(2) Ripens
Section 47a-21(d)(2) obligates a landlord to return to a tenant a security deposit, or to account to the tenant for any portion of a security deposit not returned, "within thirty days after termination of a tenancy." Failure to do so makes the landlord liable to the tenant for twice the amount of the security deposit, which the Keills seek in Count One.
By his letter to David Keill of January 12, 1994, and by his letter to Sarah Keill of January 19, 1994, Attorney Mirrione, acting on Dr. Howland's behalf, advised the Keills that their security deposit was being held to cover damages caused by their breach of the Lease. Therefore, if the termination of the Keills' tenancy occurred more than 30 days before those letters were sent, the Keills will prevail on Count One; otherwise, Dr. Howland will prevail. CT Page 11180
The Keills have made two distinct claims as to when, and by what authority, their tenancy terminated. The first is that it terminated on November 30, 1993, when, for the first time, both Keills were both out of the Keill apartment and the keys were returned to Dr. Howland. This claim is based on common law. The other claim is that their tenancy should be deemed to have been terminated, pursuant to § 47a-11a, at the time the Keills abandoned the Keill apartment, because of Dr. Howland's alleged failure to make reasonable efforts to rent it thereafter. These claims are independently discussed.
Common Law Termination of Tenancy
The Keills claim that their tenancy terminated as soon as they were both out of the Keill apartment and all keys had been returned to Dr. Howland. Dr. Howland maintains that a tenant's vacating leased premises does not terminate a tenancy and, by implication, that the Keills' tenancy did not terminate until Dr. Howland acted to terminate the Lease. Because the parties have not crisply joined issue on this question, the court frames the issue as:
 Is "tenancy," as used in § 47a-21(d)(2), synonymous with occupancy or with lease?
"Tenancy," in the context of § 47a-21(d)(2), has no statutory definition, and no case has been found which contains such a definition. (While Dewart Building Partnership v. Union Trust Co.,4 Conn. App. 683 (1985) states, "The tenancy ends only when the lessor takes some action which unambiguously demonstrates his intent to terminate the tenancy," [citations omitted], suggesting that tenancy and lease are synonymous, Dewart dealt with a commercial lease [not controlled by § 47a-21(d)(2)], and the Dewart
court was not called upon to focus on possible distinctions between tenancy and lease.)
In the absence of a statute or caselaw defining "tenancy," the court resorts to logic, and concludes that "tenancy" is that bundle of rights enjoyed by someone characterized as a "tenant." Thus, whether the Keills' tenancy terminated as a result of the termination of their occupancy depends on whether their status as tenants terminated at that time.
"Tenant" is defined in § 47a-21(a)(12), which is applicable to § 47a-21(d)(2), as follows: CT Page 11181
 "Tenant" means a tenant, as defined in section 47a-1, or a resident, as defined in section 21-64.
Section 21-64 deals with mobile home parks, and is not relevant to this case. Accordingly, the definition of "tenant" which appears in § 47a-1(1) is applicable here, and it provides:
 "Tenant" means the lessee, sublessee or person entitled under a rental agreement to occupy a dwelling unit or premises to the exclusion of others or as is otherwise defined by law.
Since "tenant" is not "otherwise defined by law" for purposes of § 47a-21(d)(2), its definition in § 47a-1(1) governs here.
Section 47a-1(1), in excerpted form, provides that a "tenant" is someone who is "entitled under a rental agreement to occupy a dwelling unit. . . ." The two essential elements of "tenant" status are entitlement to occupy (as distinguished from actual occupancy) and a rental agreement.
Under our law, the Lease, or, in the language of § 47a-1(1)), the "rental agreement," did not terminate on November 30, 1993 simply because the Keills moved out and returned the keys at that time. Were our law otherwise, a lease would lack mutuality, because a lessee would have the capacity, unilaterally, to terminate a bilateral agreement. Until Dr. Howland took some unambiguous action to declare the Lease terminated because of the Keills' breach, as she did when she granted occupancy of the Keill apartment to a new tenant on July 1, 1994, the Lease remained in effect. Dewart Building Partnership v. Union Trust Co., 4 Conn. App. 683,685 (1985).
Because the Lease remained in effect from the time the Keills moved out and returned the keys on November 30, 1993 until the new tenant took occupancy on July 1, 1994, the Keills enjoyed the right to occupy the Keill apartment under a "rental agreement" during that period (even though they chose not to exercise that right), thereby coming within the definition of "tenant" in § 47a-1(1). Because the Keills remained "tenants" under § 47a-1(1) until July 1, 1994, their "tenancy" under § 47a-21(d)(2) continued until that time. Therefore, the Keills' "tenancy" did not terminate more than CT Page 11182 30 days before Attorney Mirrione's letters to the Keills of January 12, 1994 and January 19, 1994, so that Dr. Howland's obligation to return or account to the Keills for their security deposit did not ripen prior to the dates of those letters.
Section 47a-21(d)(2) balances the interest of a landlord in enjoying the benefit of any security which has been negotiated by the parties against the interest of a tenant in seeing that a landlord does not hold a security deposit any longer than is necessary to provide to the landlord protection against damages. A tenant knows, when a security deposit bargain is struck, that the security deposit is protection to the landlord against damages resulting from the tenant's breach, and the legislature has not interfered with the rights of the parties to contract for such an arrangement. What the legislature has done is provide that it is unreasonable for a landlord to hold a security deposit for more than 30 days after a rental agreement terminates (which is the first moment when damages can be calculated), because to withhold a security deposit beyond that period harms the tenant without serving any bargained-for interest of the landlord. On the other hand, to require a landlord to return, or to account for, a security deposit before the extent of damages, if any, is known, would skew the legislatively created balance and deprive a landlord of the benefit of a negotiated bargain without serving any bargained-for interest of the tenant.
If "tenancy" in § 47a-21(d)(a) were construed to mean occupancy, then the intent of that section would be distorted, as demonstrated by the facts in this case. As of December 30, 1993 (30 days after the Keills moved out and returned the keys), the damages which Dr. Howland had already incurred were limited to non-payment of the December 1993 rent, but she clearly had reason to anticipate additional damages in an amount which could not then be calculated. Section 47a-21(d))2) requires a landlord who withholds some or all of a security deposit to provide to the tenant "a written statement itemizing the nature and amount of such damages."Costales v. Gelinas, H-906 (1989). As a result, if "tenancy" in § 47a-21(d)(2) means occupancy, then on December 30, 1993, because Dr. Howland could not itemize anticipated but unrealized damages at that time, it would have been her obligation to remit to the Keills $750 (the balance of the $1500 security deposit after deducting the December 1993 rent of $750), and thereby forego the protection against additional, reasonably anticipated damages which the bargained-for security deposit provided to her. CT Page 11183
Termination of Tenancy Pursuant to § 47a-11a
Section 47a-11a provides:
 (a) If the tenant abandons the dwelling unit, the landlord shall make reasonable efforts to rent it at a fair rental in mitigation of damages.
 (b) If the landlord fails to use reasonable efforts to rent the dwelling unit at a fair rental, the rental agreement is deemed to be terminated by the landlord as of the date the landlord has notice of the abandonment.
The Keills argue that Dr. Howland failed to make reasonable efforts to rent the Keill apartment after delivery to her home of David Keill's letter of November 30, 1993, and that, pursuant to § 47a-11a(b), the Lease is therefore deemed to have been terminated by Dr. Howland on that date. Termination of the Lease at that time would make Dr. Howland's January 1994 notices to the Keills of the withholding of their security deposit untimely under § 47a-21(d)(2), thereby compelling judgment for the Keills on Count One. Since the Keills did not breach the Lease until they failed to pay the December 1993 rent, termination of the Lease by Dr. Howland on November 30, 1993 would eliminate any claim by Dr. Howland against the Keills for breach of the Lease and compel judgment on the Counterclaim for the Keills.
It has been found that:
 Upon learning, shortly after January 5, 1994, that the Keill apartment was vacant, Dr. Howland made reasonable efforts to rent it at a fair rental in mitigation of damages . . .
Thus, Dr. Howland made reasonable efforts to rent the Keill apartment after she received actual notice of the Keills' moving out. Quaere: Did she have an obligation to try to rent the Keill apartment before she had actual notice?
Rather than specifying whether a landlord's obligation to attempt to rent an abandoned apartment begins:
1) At the moment of abandonment; CT Page 11184
2) At the moment of constructive notice (if there is one); or,
3) At the moment of actual notice;
§ 47a-11a simply provides that a landlord shall make "reasonable" efforts. In other words, the statute has made the determination of the time when a landlord's obligation to attempt to rent begins an issue of fact (did the landlord act reasonably promptly under the circumstances) rather than a question of law.
The following facts, which have been found, bear on whether Dr. Howland acted reasonably promptly in making efforts to rent the Keill apartment:
 On October 18, 1993, Sarah Keill told Dr. Howland that she was willing to remain in the Keill apartment until she found a replacement tenant;
 Until she learned, shortly after January 5, 1994, that the Keill apartment had been abandoned, Dr. Howland believed Sarah Keill still lived in it, that there was one set of keys outstanding and that the cleaning of the Keill apartment had not been completed;
 Sarah Keill learned on October 18, 1993 that Dr. Howland was going to be out of town in late November and early December 1994;
 Dr. Howland was out of town from November 20, 1993 until December 4, 1993, and from December 21, 1993 until January 5, 1994;
 The Keill apartment was vacant from October 1992 until May 1993, and during those seven months Dr. Howland was looking for a tenant;
 The primary market for rental of the Keill apartment consisted of members of the Yale community;
 The demand for housing in the Yale community relates to the September-June academic year, and there is very little demand between September and June; CT Page 11185
 After she learned that the Keill apartment was vacant, Dr. Howland took all the steps she normally took to rent an apartment, except for posting the vacancy at the housing office at Yale;
 After she learned that the Keill apartment was vacant, Dr. Howland made reasonable efforts to rent it at a fair rental in mitigation of damages.
Reduced to its essence, the issue is whether Dr. Howland should have begun efforts to rent during the 15 days when she was in town from December 6 to December 21, 1993. In view of the facts that Susan Keill knew in October that Dr. Howland would be away in early December, that Sarah Keill had led Dr. Howland to believe that she would remain in the Keill apartment until a replacement tenant was found, that David Keill had given to Dr. Howland a message suggesting that the Keill apartment had not yet been cleaned and that the housing market was dead in the Yale community at that time of year, it is held that it was reasonable for Dr. Howland to begin her efforts to rent the Keill apartment shortly after January 5, 1994.
Accordingly, the Lease is not deemed to have been terminated by Dr. Howland pursuant to § 47a-11a.
Forwarding Address Requirement of § 47a-21(d)(a)
Dr. Howland argues that, even if the Lease was terminated on November 30, 1993 on either of the grounds advanced by the Keills, nonetheless the Keills are not entitled to recover twice the value of the security deposit because they failed to comply with the provisions of § 47a-21(d)(a) relating to forwarding addresses until January 1994.
Section 47a-21(d)(2) begins: "Upon termination of a tenancy, any tenant may notify his landlord in writing of such tenant's forwarding address." That subsection goes on to provide that the landlord "shall deliver to the tenant . . . at such forwarding address" the security deposit, or an accounting for it. Thus, the 30 day period during which a landlord must return or account for a security deposit does not begin to run until two things have occurred: the tenancy has been terminated, and the tenant has provided to the landlord a forwarding address. Relevant to the question of when the Keills met the forwarding address requirement of § 47a-21(d)(2) are the following facts, which have been found: CT Page 11186
Both Keills executed the Lease;
 Both Keills signed the check which constituted the security deposit, which was drawn on their joint account;
 The Keills' marriage was foundering on November 30, 1993;
 Before November 30, 1993, the Keills had established separate residences;
 In his letter of November 20, 1993, David Keill said ". . . we will expect the full return of our security deposit";
 By his letter of November 30, 1993, David Keill provided to Dr. Howland his forwarding address and requested "return of the full amount of the security deposit to me";
 Sarah Keill did not provide to Dr. Howland her forwarding address until she sent to Dr. Howland her letter of January 14, 1994, which also contained the following: "The security deposit for 221 Greene Street was paid entirely from David Keill's personal money. Therefore the entire deposit of $1,500.00 should have been forwarded to him"; and,
 Sarah Keill did not provide to Dr. Howland any directive concerning to whom the security deposit should be returned before sending Dr. Howland her letter of January 14, 1994.
It is the Keills' position that notification to Dr. Howland of David Keill's forwarding address, and David Keill's request for return to him of the entire security deposit, both of which were contained in David Keill's letter of November 30, 1993, triggered the obligation of Dr. Howland to remit the entire security deposit, or an accounting for it, to David Keill within 30 days thereafter. This claim involves three distinct issues:
 1) Was notice of the forwarding address of David Keill, only, sufficient to invoke Dr. Howland's obligations under § 47a-21(d)(2)? CT Page 11187
 2) Was Dr. Howland obligated to return the entire security deposit to David Keill on the request of him, only, to do so, only ten days after he had described it as "our security deposit"? and,
 3) If Dr. Howland was not obligated to return the entire security deposit to David Keill on the request of him, only, was she obligated to return one-half of the security deposit to him?
Answering these questions requires a review of the purpose of § 47a-21(d)(2), which is construed to ensure that a security deposit goes from a landlord into the hands of the person entitled to it in a timely manner. In this case, the signatures of both David and Sarah Keill were on the check which constituted the security deposit delivered to Dr. Howland on May 1, 1993, a time when the Keill marriage was presumably healthy. By November 30, 1993, when David Keill provided his forwarding address to Dr. Howland and requested delivery of the entire security deposit to him, the Keill marriage was foundering. As a tenant, Sarah Keill could have notified Dr. Howland of her forwarding address, and given direction to her about the party to whom the security deposit should be returned, by an agent, such as an attorney. Jankus v. Coenta,
NH-380 (1986). However, Dr. Howland would certainly have acted at her peril had she assumed on November 30, 1993 that David Keill was Sarah Keill's agent for purposes of waiving any interest of Sarah Keill's in the security deposit without some authorization from Sarah Keill to treat David Keill as Sarah Keill's agent.
As borne out by Sarah Keill's letter to Dr. Howland of January 14, 1994, the security deposit was not a joint asset of the Keills, but rather a separate asset of David Keill. It could, of course, just as easily have been a separate asset of Sarah Keill. Had that been the case, return of even one-half the security deposit to David Keill might have exposed Dr. Howland to liability.
Under these facts, it is held that a statement from both Keills of the party entitled to receive the security deposit, together with the forwarding address to which the security deposit should be delivered, was required to invoke Dr. Howland's obligations under § 47a-21(d)(2). Since word was not received by Dr. Howland on these matters until her receipt of Sarah Keill's letter of January 14, 1994, Attorney Mirrione's letters to the Keills of January 1994 were not untimely, and Dr. Howland did not CT Page 11188 default on her obligations, under § 47a-21(d)(2).
Conclusion (Count One)
The issues on Count One are found for Dr. Howland.
Conclusion (Counterclaim)
The findings establish that:
The parties executed the Lease;
The Keills breached the Lease;
 Dr. Howland made reasonable efforts to rent the Keill apartment after the Keills' breach at a fair rental; and,
 Dr. Howland's losses and expenses resulting from the Keills' breach are $7,540.40, exclusive of attorney's fees;
Dr. Howland claims recovery, in addition to the $7,540.40 referenced above, for the Keills' failure to comply with the following provision of the Lease:
 H[2]O bill which includes sewer use charge as well as RWA to be paid every 3 months with separate check to landlord 1st check to arrive in Aug 1, 93. Any adj. based on actual cost to be done yearly or at lease's termination.
Section 47a-7(a) provides, in excerpted form: "A landlord shall . . . (6) supply running water. . . ." Because the quoted provision of the Lease contravenes § 47a-7(a), that provision is unenforceable, and Dr. Howland may not recover for the Keills' failure to comply with it. Section 47a-4(a).
The Lease provides that the Keills are liable for Dr. Howland's attorney's fees incurred in enforcing any of the Keills' obligations under the Lease. Pursuant to § 42-150aa and § 47a-4(7), Dr. Howland cannot recover an attorney's fee in this case which is greater than 15% of the judgment entered in her favor. Fifteen percent of Dr. Howland's damages on the Counterclaim equals $1,131.06. CT Page 11189
The issues on the Counterclaim are found in favor of Dr. Howland, and she is entitled to recover damages of $7,540.40 plus an attorney's fee of $1,131.06. Against this amount is set off the security deposit of $1500, which is hereby awarded to Dr. Howland, together with interest on the security deposit calculated as described below.
Section 47a-21(i)(1) provides that a landlord shall pay to a tenant, on the anniversary of the tenancy, interest on a security deposit at a rate published periodically in the Federal Reserve Board Bulletin. That rate for the period from May 1, 1993 to June 30, 1993 was 4%. From July 1, 1993 until November 30, 1993, that rate was 2.9%. Section 47a-21(i)(1) also provides:
 In any case where a tenant or resident has been delinquent for more than ten days in the payment of any monthly rent, he shall forfeit any interest which would otherwise be payable to him for that month, except that there shall be no such forfeiture if, pursuant to a provision of the rental agreement, a late charge is imposed for failure to pay such rent within the time period provided by section 47a-15a.
Article Twenty-Eight, Section 9 of the Lease provides a monthly late charge of $35. However, Dr. Howland has not sought to recover a late charge for any of the seven months for which the Keills failed to pay rent, and no evidence was introduced to establish that, even though the Lease provided for a late charge, Dr. Howland ever sought to impose one. (Because the late charges under the Lease would greatly exceed interest on the security deposit, it would have been to Dr. Howland's advantage to impose a late charge for the months from December 1993 to June 1994 and to pay interest to the Keills on the security deposit for those months.)
Because the Keills were delinquent for more than ten days in paying the rent during each month from December 1993 through June 1994, they are not entitled to interest on the security deposit for those months. Because the tenancy terminated on July 1, 1994, and damages were calculable by Dr. Howland on that date, Dr. Howland is deemed to have applied the security deposit against her damages on that date. Ergo, no interest has accrued since the July 1, 1994 CT Page 11190 termination of the Keills' tenancy.
Interest at the annual rate of 4% on the $1500 security deposit for the months of May and June 1993 is $10. Interest at the annual rate of 2.9% on the $1500 security deposit for the five months from July through November 1993 is $18.15. Accordingly, the total interest due on the security deposit is $28.15.
The Keills are entitled to credits against the judgment on the Counterclaim of $1500 (for the security deposit, which is awarded to Dr. Howland), and of $28.15 (for interest on the security deposit), totalling $1,528.15. Thus, Dr. Howland's damages of $7,540.40 on the Counterclaim will be reduced by $1,528.15, for a net recovery on the Counterclaim to Dr. Howland of $6,012.25, plus an attorney's fee of $1,131.06.
COUNT TWO
Pursuant to § 42-151, the Lease is a "consumer contract." Pursuant to § 42-152(a), every "consumer contract" entered into after June 30, 1980 (as the Lease was) "shall be written in plain language." Section 42-152(b) establishes two alternative methods of determining if a "consumer contract" is "written in plain language." Each of those methods requires that in order to meet the "plain language" test, a consumer contract must, inter alia,
use "personal pronouns, the actual or shortened names of the parties to the contract, or both, when referring to the parties." Because the Lease does not comply with this requirement, the Lease is not written in "plain language," and the other claims of the Keills as to the "plain language" defects in the Lease are not addressed herein.
As previously noted, § 42-154 provides that a lessor on a "consumer contract" which is not written in "plain language" is liable to the other party to the lease for statutory damages of $100. (§ 42-155 provides that, even when more than one consumer is a party to a consumer contract which fails the "plain language" tests, as is the case with the Lease, only one award for damages may be made.) Accordingly, Dr. Howland is liable to the Keills under § 42-154.
Section 42-154 provides that the court may, in its discretion, award an attorney's fee not to exceed $100 to a successful plaintiff in an action brought pursuant to that section. None of the factors traditionally considered to justify the unusual award CT Page 11191 of an attorney's fee having been found in this case, the court declines to exercise its discretion to make such an award.
JUDGMENT
Judgment is entered as follows:
On Count One, in favor of Dr. Howland;
 On Count Two, in favor of David Keill and Sarah Keill to recover $100 from Dr. Howland; and,
 On the Counterclaim, in favor of Dr. Howland to recover $7,540.40, together with an attorney's fee in the amount of $1,131.06, from David Keill and Sarah Keill.
The judgment on Count Two in favor of David and Sarah Keill in the amount of $100 is hereby set-off against the judgment on the Counterclaim in favor of Dr. Howland, thereby reducing the judgment on the Counterclaim by that amount.
Further, the Keills' security deposit of $1500, and the interest on it of $28.15, are awarded to Dr. Howland and shall be a credit against the judgment on the Counterclaim in her favor.
The amount of the judgment on the Counterclaim, including the attorney's fee, which remains to be satisfied, and on which execution may issue if not satisfied, after adjustments for the set-off and credit set forth above is $7,043.31. NorthwesternElectric, Inc. v. Rozbicki, 6 Conn. App. 417 (1986).
George Levine, Judge